UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                         :

BERKLEY ASSURANCE COMPANY,        :

                                         :

                   Plaintiff,       :

                                         :           19-CV-2879 (JMF)

        -v-                      :

                                         :           <u>OPINION AND ORDER</u>

HUNT CONSTRUCTION GROUP, INC.,    :

                                         :

                   Defendant.     :

                                         :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Berkley Assurance Company ("Berkley") brings this diversity action against

Hunt Construction Group, Inc. ("Hunt"), seeking a declaration that certain claims asserted

against Hunt in other litigation are not covered by insurance policies that Berkley issued in 2016

and 2017. *See* ECF No. 1 ("Compl."). Hunt filed counterclaims against Berkley, seeking the

opposite relief: a declaration that the underlying claims are covered by the policies and that

Berkley has a duty to defend Hunt from those claims, and damages for breach of contract. *See*

ECF No. 18 ("Answer."). Now before the Court are Hunt's motion for partial summary

judgment, seeking a declaration that Berkley is obligated to fund its defense of the underlying

claims, *see* ECF No. 27, and Berkley's motion for summary judgment, *see* ECF No. 67. For the

reasons that follow, Hunt's motion is DENIED, and Berkley's motion is GRANTED.

<strong>BACKGROUND</strong>

**A. The Policies**

      Hunt is a construction management firm and, in 2016, it applied for, and Berkley issued,

an insurance policy protecting against, among other things, professional liability. *See* ECF No.

80 ("Hunt 56.1 Stmt."), ¶¶ 1-2. Significantly, the policy — which took effect on June 15, 2016,

and was initially scheduled to expire on June 15, 2017 — was a "claims-made-and-reported policy," meaning that its coverage was defined by the dates on which claims were first made by or against Hunt *and* reported to Berkley.  *See* ECF No. 30-1 ("2016-2017 Policy"), at 12, 18.

The first page of the 2016-2017 Policy included a notice informing Hunt that it was "a claims made and reported policy" and that it "applie[d] only to claims which are first made by or against [Hunt] during the policy period or the optional extended reporting period, if applicable, and first reported in writing to [Berkley] in those periods or the automatic extended reporting period."  *Id.* at 12.  The provision establishing the automatic extended reporting period ("AERP"), in turn, provided that, "[i]f [Berkley] or [Hunt] terminate[s] or non-renew[s] this insurance for any reason, other than nonpayment of premium or [Hunt's] failure to comply with any term or condition, or fraud or material misrepresentation, [Hunt] shall be entitled to a period of sixty (60) days from the date of policy termination to report a Claim . . . which is made by or against you prior to such termination date."  *Id.* at 29 (Policy Section IX.A).

The policy also provided that, under the same circumstances, Hunt could purchase an optional extended reporting period ("OERP"), which would extend the policy's coverage to claims both made and reported between twelve and thirty-six months after the policy period expired (depending on the additional premium paid).  *Id.* (Policy Section IX.B).  Under the policy, "Claims . . . arising out of one or more acts, errors, omissions, incidents, events . . . or a series thereof, that are related (either causally or logically), will be considered a single Claim" — that is, "first made on the date the earliest such Claim . . . was first made" and is covered "only [by] a Policy providing coverage for the earliest such Claim."  *Id.* at 28-29 (Policy Section VIII).  The policy also expressly excluded from coverage any "liability under contract, agreement,

warranty or guarantee, except such liability that would have existed in the absence of such

contract or agreement."  *Id.* at 26 (Policy Section V.G) (the "Contractual Liability Exclusion").

Berkley and Hunt extended the expiration date of the 2016-2017 Policy to July 15, 2017,

*see* Hunt 56.1 Stmt. ¶ 6, and later agreed to a materially identical renewal policy, which ran from

July 15, 2017, to June 15, 2018, *see* ECF No. 30-2 ("2017-2018 Policy").  Berkley and Hunt

later agreed to another one-year renewal policy.  *See* ECF No. 85, ¶ 39.

## B.  The Underlying Litigation

The parties dispute whether the policies cover claims arising out of a project to renovate

Hard Rock Stadium in Miami, Florida.  In 2014, Hunt was hired by South Florida Stadium LLC

("SFS"), which owns the stadium, to serve as the renovation project's construction manager.  *See*

ECF No. 40, ¶ 4.  As relevant here, Hunt solicited bids for design and steel fabrication services

for the stadium's rooftop canopy structure, and it ultimately selected Alberici Constructors, Inc.,

which did business as Hillsdale Fabricators ("Hillsdale").  Hunt 56.1 Stmt. ¶ 4; ECF No. 40, ¶ 5.

Hillsdale soon grew frustrated with Hunt's management of the project and complained that,

because Hunt performed design and construction services improperly, it had incurred additional

and unforeseen costs.  *See* ECF No. 40, ¶ 7.  On April 20, 2016, Hunt, Hillsdale, and SFS entered

into a "Memorandum of Understanding," in which all parties recognized that "Hillsdale ha[d]

submitted a request" for cost increases and agreed "to postpone engaging in substantive

resolution" of Hillsdale's claims until it had substantially completed its work on the project.  *See*

ECF No. 42 ("9/27/19 O'Neill Decl."), Ex. A at ¶ 7.  Hillsdale completed its work on the project

in or around July 2016, *see* Hunt 56.1 Stmt. ¶ 21, and, on September 19, 2016, sent a "Request

for Contractual Reconciliation and Request for Change Order" seeking payment from Hunt, *see*

9/27/19 O'Neill Decl., Ex. B at 40.

Apparently unable to reach an agreement, SFS and Hunt filed a lawsuit against Hillsdale in Florida state court on October 11, 2016, seeking a declaration regarding the parties' respective rights and obligations. *See* Compl. ¶ 19; Answer ¶ 19. One week later, Hillsdale filed a lawsuit in federal court against Hunt, SFS, and the project's lead engineer, asserting claims against Hunt for breach of contract and abandonment of contract. *See* Hunt 56.1 Stmt. ¶ 23. Hillsdale voluntarily dismissed the federal court action in favor of proceeding in state court. *See id.* ¶ 25. On March 30, 2017, Hillsdale filed counterclaims against Hunt for breach of contract and abandonment of contract and against SFS for negligence. *See id.* ¶¶ 25, 41. In June 2017, the Florida state court dismissed Hillsdale's claim against Hunt for "abandonment of contract," leaving only its claim for breach of contract (the "Hillsdale Claim"). *See id.* ¶ 26. In the Hillsdale Claim, Hillsdale alleged that Hunt had "breached the Subcontract" by, for example, "providing plans and specifications to Hillsdale which were not constructible"; "failing to execute its contractual design assist responsibilities so as to maintain the Project scope, schedule and budget"; "misrepresenting the tonnage to be fabricated and erected"; "failing to properly schedule and coordinate the work"; "failing to issue change orders to which Hillsdale was entitled"; and "failing to provide an equitable adjustment of the Subcontract Sum." ECF No. 30-3, ¶ 54. On April 9, 2018, Hillsdale filed an answer to Hunt's claims, alleging that "Hunt was comparatively negligent as more particularly set forth" in its counterclaim. *See* ECF No. 60-1, at Affirmative Defenses ¶ 5.

On June 1, 2017, Hunt completed an application for a renewal insurance policy. *See* 9/27/19 O'Neill Decl., Ex. C at 7. The application asked whether "any claim, suit, notice or legal action [had] been made or brought . . . against your company," to which Hunt answered "no." *Id.* Ex. C at 6. Berkley issued Hunt a renewal policy, which ran from July 15, 2017, to

June 15, 2018.  *See* 2017-2018 Policy.  Hunt reported the Hillsdale Claim to Berkley on July 20, 2017 — five days after the 2016-2017 Policy period ended and five days into the 2017-2018 Policy period.  *See* Hunt 56.1 Stmt. ¶¶ 31, 33.  On September 25, 2017, Berkley formally refused coverage, on the ground that the Hillsdale Claim was purely contractual and therefore not covered by virtue of the Contractual Liability Exclusion.  *See* ECF No. 30-6, at 5.  Berkley also noted that it "reserve[d] the right to raise additional terms and conditions as a defense to coverage" and that its "failure to cite policy language at this time" is not intended to "preclude [it] from raising other coverage defense[s] in the future."  *Id.* at 6.

On May 21, 2018, SFS sent a letter to Hunt, stating that "Hunt is required to indemnify and hold SFS harmless from any . . . damages [resulting from Hillsdale's counterclaim against SFS] . . . in accordance with the parties' April 24, 2015 Construction Management Agreement."  ECF No. 60-1, at 83 (the "SFS Claim").  Two weeks later, Hunt notified Berkley of the SFS Claim.  *See* Hunt 56.1 Stmt. ¶ 40.  On December 20, 2018, Berkley informed Hunt that it would reimburse attorney's fees beginning on May 21, 2018.  *See* ECF No. 30-12.  Hunt continued to retain its own legal counsel, but Berkley required Hunt to abide by its counsel guidelines, *see* ECF No. 52-3, and Hunt sent Berkley unredacted attorney invoices, *see* Hunt 56.1 Stmt. ¶ 44.  Berkley never reimbursed Hunt's attorney's fees.  *Id.*  Instead, Berkley investigated coverage in early 2019 and denied it on April 1, 2019, the same date on which it filed this declaratory judgment action to settle the coverage issue.  *Id.*  SFS has not filed suit against Hunt, and the parties have not identified any action that SFS has taken to obtain indemnification since sending the May 21, 2018 letter.  *Id.* ¶ 42.

### LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party."  *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.

2011).  Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein."  *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

In this case, summary judgment turns on the interpretation of insurance contracts.  It is well established that the insured — here, Hunt — bears the burden of proving that the policy affirmatively provides for coverage of the claim, "while the insurer bears the burden of proving that an exclusion in the policy applies to defeat coverage."  *Georgetown Capital Grp., Inc. v. Everest Nat'l Ins. Co.*, 104 A.D.3d 1150, 1152 (4th Dep't 2013) (citing *Con. Ed. Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 218 (2002)).  Courts must interpret "the language of the policy . . . in light of common speech and the reasonable expectations of a businessperson."  *Shants, Inc. v. Capital One, N.A.*, 124 A.D.3d 755, 759 (2d Dep't 2015) (internal quotation marks and citation omitted).  But if the language is ambiguous — that is, if it does not have "a definite and

precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion," *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) (internal quotation marks omitted) — the Court must resolve any ambiguity "in favor of the insured and against the insurer," *Shants, Inc.*, 124 A.D.3d at 759. These standards are especially rigorous when applied to policy exclusions, which are "subject to strict construction and must be read narrowly." *Automobile Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006). If the insured "offer[s] a plausible interpretation of the . . . exclusion that would result in a determination of coverage, its position must be sustained." *Nat'l Football League v. Vigilant Ins. Co.*, 36 A.D.3d 207, 212-13 (1st Dep't 2006).

An insurer's duty to defend is broader than the duty to pay. An insurer must defend a claim if the "complaint contains any facts or allegations which bring the claim even potentially within the protection purchased." *Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 15 N.Y.3d 34, 37 (2010) (internal quotation marks omitted). If the insurer argues that a claim falls within an exclusion, the insurer bears "the heavy burden of showing that the exclusion applies in the particular case and is subject to no other reasonable interpretation." *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 654-55 (1993). But if, "as a matter of law[,] . . . there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify its insured under any policy provision," then the duty to defend does not apply. *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 45 (1991).

## DISCUSSION

Applying the foregoing standards here, the Court concludes that Berkley's motion for summary judgment must be granted in its entirety, and Hunt's motion for partial summary

8

judgment must be denied in its entirety.  The Court will begin with coverage for the Hillsdale Claim and then turn to coverage for the SFS Claim.

## A.  The Hillsdale Claim

First, the Hillsdale Claim is not covered by the 2016-2017 Policy, and Berkley has no duty to defend Hunt against it, because Hunt failed to report that claim within the time allotted by the policy.  As noted, the policy at issue is a claims-made-and-reported policy, meaning that coverage generally extends only to those claims made by or against the insured *and* reported to the insurer within the policy period.  Such a policy "protects the insured for claims made against it and reported to the insurer within the policy period or, if applicable, the extended reporting period."  *CheckRite Ltd. v. Ill. Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000).  Under certain circumstances, insureds are accorded  — either by law or the policy itself — an additional period in which to report claims made by or against the insured during the policy period.  Here, the parties agree that, although Hillsdale filed claims against Hunt on October 18, 2016, Berkley did not report the Hillsdale Claim to Berkley until July 20, 2017 — more than nine months later and five days after the 2016-2017 Policy expired.  *See* Hunt 56.1 Stmt. ¶¶ 23, 31, 33.  Hunt nonetheless argues that notice was timely because it reported the claim within the sixty-day AERP that purportedly followed the policy period.

By its terms, however, the AERP is not relevant to the Hillsdale Claim.  The provision setting forth the AERP plainly states that Hunt is "entitled to a period of sixty (60) days from the date of policy termination to report" a claim made during the policy period, but only "[i]f [Berkley] or [Hunt] terminate[s] or non-renew[s]" the policy.  2016-2017 Policy at 29.  Neither event occurred here.  To the contrary, the parties agreed to renew insurance coverage for an additional eleven months.  And neither Berkley nor Hunt terminated the 2016-2017 Policy.

Instead, the policy remained in force until its period expired.  Accordingly, the 2016-2017 Policy does not cover any claim reported after the policy period, including the Hillsdale Claim.  *See Liberty Ins. Underwriters, Inc. v. Perkins Eastman Architects, P.C.*, 101 A.D.3d 650, 651 (1st Dep't 2012) (holding that "endorsement . . . giving [the insured] an additional 60 days after [the policy's expiration] to give notice of the claim . . . by its terms, applies only if the policy terminates or is not renewed, neither of which occurred here").

Hunt's attempts to create ambiguity out of the policy's plain language are unavailing.  In what may be its strongest argument, Hunt notes that, in multiple locations, the policy qualifies the OERP with the words "if applicable," but it does not so qualify the AERP.  *See* 2016-2017 Policy at 12 (notice that the policy "applies only to claims which are first made by or against you during the policy period or the optional extended reporting period, *if applicable*, and first reported in writing to us in those periods or the automatic extended reporting period" (emphasis added)); *id.* at 30 (requiring that claims be reported "during the Policy Period, the Automatic Extended Reporting Period, or during *any applicable* OERP" (emphasis added)).  It follows, Hunt argues, that every insured must have the opportunity to report claims within sixty days of the policy's termination.  But Hunt's argument proves too much.  The AERP is also not available to insureds who fail to pay the premium, violate a term or condition of the policy, commit fraud, or make a material misrepresentation.  *See* 2016-2017 Policy at 29.  Yet Hunt's interpretation would require that those conditions — just like the condition that "[Berkley] or [Hunt] terminate or non-renew this insurance," *id.* — be ignored, an absurd result.  It cannot be that *every* insured can obtain coverage for claims reported after a policy's expiration notwithstanding an express condition to the contrary.  *See, e.g.*, *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13-CV-3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) ("[A] contract should not

be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (internal quotation marks and alterations omitted)).

Next, Hunt argues that the AERP is triggered by policy "termination," which can be interpreted to include policy "expiration."  *See* ECF No. 28 ("Def.'s Mem."), at 16; ECF No. 51 ("Reply"), at 4.  But the policy provides that the insured is "entitled to a period of sixty (60) days from the date of policy termination to report" a claim only "if [the insurer] or [the insured] terminate[s]" the policy — *not* upon the policy's "termination."  2016-2017 Policy at 29.  That is, the policy required Berkley or Hunt to act — and it is undisputed that neither did.  Hunt also erroneously argues that an extended reporting period must follow the termination of every policy because the AERP is "automatic."  *See* Def.'s Mem. 16; Reply 4.  But something can be "automatic" without always being in effect.  A car with an automatic transmission, for example, does not reach fifth gear every time it is driven; it moves into fifth gear only when certain conditions are met.  The important point is that the "automatic" event occurs mechanically, without an actor's intervention.  *See* Automatic, *Merriam-Webster's Dictionary* (defining "automatic" to mean, among other things, "having a self-acting or self-regulating mechanism").  And so it is with the AERP.  If Berkley or Hunt had terminated or non-renewed the 2016-2017 Policy, Hunt would have been entitled to an additional sixty days in which to report claims without any further action.  But neither did, and so the AERP provision did not provide Hunt with an extended reporting period.

According to Hunt, "Berkley's own prior failure to challenge the timeliness of Hunt's notice is strong evidence that Berkley itself understood the AERP to have been triggered and in effect at the time notice was given."  *See* Reply 6.  But where, as here, the relevant contract language is unambiguous, there is no basis to look beyond the four corners of the contract at a

party's subjective understanding.  *See, e.g.*, *AAR Allen Servs. Inc.*, 2014 WL 1807098, at *4

("[N]either extrinsic evidence nor the parties' subjective intent operates to vary the terms of an

unambiguous contract.").  And in any event, the record suggests that Berkley had no such

understanding.  The claims notes reflect that it did not even occur to Berkley that the Hillsdale

Claim could be covered by the 2016-2017 Policy.  Instead, Berkley initially assumed that,

because the Hillsdale Claim was reported on July 20, 2017, only the 2017-2018 Policy was

relevant — and that it did not cover the Hillsdale Claim because it was not first made against

Hunt during the policy period.  *See* ECF No. 69 ("11/12/19 O'Neill Decl."), Ex. R at 3.  In light

of that evidence, accepting Hunt's argument would undermine the principle, discussed in more

detail below, that waiver cannot operate to expand the scope of insurance coverage.  *See Gallien*

*v. Conn. Gen. Life Ins. Co.*, 49 F.3d 878, 885 (2d Cir. 1995) ("[I]f an insured's claim is outside

the scope of coverage, then the doctrine of waiver is inapplicable.").

Hunt also argues that its interpretation must be reasonable because it is the only

interpretation that would avoid "anomalous and unreasonable forfeitures of coverage" of claims

made just before the end of the policy period.  Def.'s Mem. 16-19.  But New York law, which

governs this policy, expressly prohibits the results that Hunt fears.  *See* N.Y. Ins. Law.

§ 3420(a)(4) ("[F]ailure to give any notice . . . within the time prescribed shall not invalidate any

claim made by the insured . . . if it shall be shown not to have been reasonably possible to give

such notice within the prescribed time and that notice was given as soon as was reasonably

possible thereafter.").  Regardless, the policy's purpose is not to provide insurance coverage

without limit.  The cut-off date "is integral to a claims-made policy, as it is 'a distinct

characteristic of such a policy that directly relates to rate setting.'"  *CheckRite*, 95 F. Supp. 2d at

191-92 (quoting *Rochwarger v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 192 A.D.2d 305,

305 (1st Dep't 1993)).  And ultimately, it is the Court's task to give effect to the intent of the

parties, as expressed in the language of their contract, not to reform the contract merely because,

in retrospect, a different agreement would better suit Hunt's interests.  *See, e.g.*, *Stone Key*

*Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 324 (S.D.N.Y. 2018) ("The

fundamental objective of contract interpretation is to give effect to the expressed intentions of the

parties.  The best evidence of the parties' intent, of course, is the contract itself." (internal

quotation marks, alterations, and citation omitted)).[1]

Hunt claims to find support from *New England Environmental Technologies v. American*

*Safety Risk Retention Group, Inc.*, 738 F. Supp. 2d 249 (D. Mass. 2010), in which the court noted

that "[t]he purpose of the extended reporting option is to provide a short period after a policy's

expiration within which the insured may report a claim that occurred during the policy period

and still obtain coverage."  Def.'s Mem. 18 (quoting *New England Envt'l Techs.*, 738 F. Supp.

2d at 256).  But Hunt takes the statement out of context.  The *New England Environmental*

*Technologies* court was describing the scope of an extended reporting period's coverage, not

whether the insured was entitled to it.  In that case, the insurer attempted to evade coverage by

arguing that the extended reporting provision covered only claims *both* made and reported during

the first thirty days after the policy period ended, and excluded claims made during the policy

period.  *See* 738 F. Supp. 2d at 255-56.  Here, Berkley and Hunt do not dispute what the

extended reporting period covers — they merely dispute whether Hunt is entitled to it.  To be

---

[1]      Hunt's argument that failing to provide an extended reporting period upon renewal
"would defeat the very purpose of the automatic extension reporting period" fails for similar
reasons.  Def.'s Mem. 17.  Moreover, the central purpose of extended reporting periods is to
"protect[] those insureds [whose policies are not renewed] against the gaps in coverage that can
result from switching to an occurrence policy or to another claims-made policy," as such
policies, unlike renewal policies, often "limit[] coverage for prior acts."  *Ehrgood v. Coregis Ins.*
*Co.*, 59 F. Supp. 2d 438, 447 (M.D. Pa. 1998).

sure, the parties in *New England Environmental Technologies* also debated that question, but, unlike here, the language was truly ambiguous.  The insurer was entitled to an extended reporting period only "if no other similar insurance is in force at the time," and the parties disputed whether a renewal policy is "*other* similar insurance."  *Id.* at 252, 257-58 (emphasis added).  The court found that the meaning of that phrase was "impossible to determine, from the text alone," and it resolved doubt in favor of the insured.  *Id.* at 257.  Here, there is no ambiguity for the Court to resolve.

The second case upon which Hunt relies, *Cast Steel Products, Inc. v. Admiral Insurance Company*, 348 F.3d 1298 (11th Cir. 2003), is unpersuasive and, of course, non-binding.  The policy in that case provided for an extended reporting period if the policy was "cancelled or not renewed" by the insured.  348 F.3d at 1302.  The court claimed that the policy was "clearly ambiguous" as to whether renewal triggered the reporting period and resolved doubt "so as not to deny coverage."  *Id.* at 1304.  But it is far from clear why the court concluded that the language of the policy was ambiguous; indeed, the court itself observed without qualification that the insured "chose neither of the two options" that triggered the only extended reporting period described in the policy.  *Id.* at 1302, 1304.  The court seems to have treated the policy's silence regarding the effect of renewal as ambiguous, *see id.* at 1304 & n.8 (explaining its finding of ambiguity by noting that the insurer was "unable to explain what the reporting period would be for claims accruing on the last day, or within a very short period, of the conclusion of the policy period"), but failed to explain why that resulted in ambiguity, as opposed to non-coverage.  Additionally, *Cast Steel*'s finding of ambiguity was rooted in equitable concerns not relevant here.  In that case, the insured instructed its insurance broker to report the claim "immediately" after receiving it, but the broker failed to do so until "just hours" after the policy expired.  *Id.* at

1300.  Under those circumstances, the Eleventh Circuit found that it would be "illogical and inequitable to deny coverage."  *Id.* at 1304.  But there are no similar equitable considerations at play here.  Hillsdale formally asserted its claim against Hunt on October 18, 2016, nearly nine months before the 2016-2017 Policy expired.  *See* Hunt 56.1 Stmt. ¶ 23.  Hunt does not even attempt to explain its own delay, despite the fact that many cases have held that an unexplained delay of similar duration may preclude coverage in and of itself.  *See, e.g.*, *United Nat'l Ins. Co. v. 515 Ocean Ave., LLC*, 477 F. App'x 840, 843-44 (2d Cir. 2012) (summary order) (collecting cases holding that delays of between twenty-two days and six months are unreasonable as a matter of law).

The decision in *CheckRite* is more persuasive.  In that case, the policy at issue provided that, if the policy was "cancelled or nonrenewed by an Insured or [the insurer]," the insured could purchase an extended reporting period for an additional premium.  95 F. Supp. 2d at 186.  The insured argued that the fact that such an option was available only "if the policy [was] cancelled or nonrenewed mean[t] that there [was] no need to purchase an extended reporting period if the policy [*was*] renewed, and that an extended reporting period [was] 'inherent in the renewal.'"  *Id.* at 192.  The court disagreed, finding that the policy language "simply does not speak to what happens when a policy is renewed" and refusing to create an extended reporting period out of whole cloth.  *Id.* at 193.  The insured in *CheckRite*, like Hunt, "hypothesize[d] a scenario in which an insured receives a claim on the last day of its policy, which policy is then renewed effective the following day, but the insured does not report the claim until a few days into the renewal policy."  *Id.* at 193 n.9.  The court dismissed the hypothetical because the facts presented did not "involve an eleventh-hour claim."  *Id.*  *CheckRite* — not *Cast Steel* — reflects the majority, and more compelling, position.  *See, e.g.*, *Alaska Interstate Constr., LLC v. Crum &*

*Forster Specialty Ins. Co.*, 696 F. App'x 304, 305 (9th Cir. 2017) (mem.) (characterizing *Cast Steel* and its progeny as "a minority view that has been criticized" and holding that an extended reporting period was not triggered by renewal because it applied only if the policy "is canceled or not renewed" by the insured); *GS2 Eng'g & Envt'l Consultants, Inc. v. Zurich Am. Ins. Co.*, 956 F. Supp. 2d 686, 693 n.11 (D.S.C. 2013) (criticizing *Cast Steel* for relying "on a generalized notion of fairness, rather than . . . analysis of the language in the policy before the court"); *Capitol Specialty Ins. Corp. v. Big Sky Diagnostic Imaging, LLC*, No. 17-CV-54 (BLG) (SPW) (TJC), 2019 WL 1245642, at *9 (D. Mont. Jan. 30, 2019) (characterizing *Cast Steel* and similar cases as "represent[ing] a distinct minority view").

Finally, the Court holds that Berkley did not waive its argument that coverage of the Hillsdale Claim is barred because it was not reported during the relevant policy period, even though the company referenced only the Contractual Liability Exclusion when it first denied coverage.  The overwhelming weight of authority holds that such an argument is not subject to waiver because the doctrine of waiver "may not operate to create coverage where it never existed."  *McCabe v. St. Paul Fire & Marine Ins. Co.*, 79 A.D.3d 1612, 1613 (4th Dep't 2010) (internal quotation marks and ellipsis omitted)); *accord Calocerinos & Spina Consulting Eng'rs, P.C. v. Prudential Reinsurance Co.*, 856 F. Supp. 775, 780 (W.D.N.Y. 1994); *Checkrite Ltd.*, 95 F. Supp. 2d at 190; *Certain Underwriters at Lloyds London Subscribing to Policy No. PGIARK01449-05 v. Advance Transit Co.*, No. 150656/2019, 2020 WL 836801, at *2 (N.Y. Sup. Ct. Feb. 14, 2020).  Hunt fails to cite, and the Court has not found, any case holding that an insurer waived such an argument under a claims-made-and-reported policy.  Hunt contends that its position is supported by *JPMorgan Chase & Co. v. Travelers Indemnity Co.*, 880 N.Y.S.2d 224 (Table), 2009 WL 137044 (N.Y. Sup. Ct. Jan. 12, 2009), but, notably, that case concerned

the *sufficiency*, not the timeliness, of notice.  *Id.* at \*5.  Although coverage turns on the date a

claim is reported, it does not turn on the content of the notice.  And although a deficiency in the

content of a notice is curable, a deficiency in its timeliness is not.

   Nor, relatedly, is Berkley estopped from asserting its timeliness argument.  As an initial

matter, it is not at all clear that Berkley can even be estopped from asserting that the claim is not

covered.  *See Liberty Mut. Ins. Co. v. McDonald*, 6 A.D.3d 614, 615 (2d Dep't 2004) ("[W]here

. . . the denial of the claim is based upon a lack of coverage, estoppel may not be used to create

coverage regardless of whether or not the insurance company was timely in issuing its

disclaimer."); *see also Nafash v. Allstate Ins. Co.*, 137 A.D.3d 1088, 1089 (2d Dep't 2016)

(rejecting an insured's contention that an insurer was estopped from denying coverage "based

upon its untimely disclaimer of coverage [as] without merit since a disclaimer is unnecessary

when a claim does not fall within the coverage terms of an insurance policy").  *But see Gen. Acc.

Ins. Co. of Am. v. Metropolitan Steel Indus.*, 9 A.D.3d 254 (1st Dep't 2004) (rejecting the

"argument that estoppel cannot be applied to create coverage where none exists where . . . the

insured was covered by the policy at the time of the loss, albeit perhaps not for the type of loss

claimed, and lost control of its defense in reliance upon the insurer having undertaken its defense

without a reservation of rights" (citations omitted)). In any event, Hunt does not even attempt to

articulate how it is prejudiced by Berkley's delayed assertion that the Hillsdale Claim was

reported outside of the policy period, as it must if it is to prove estoppel.  *See* ECF No. 77, at 19-

20 (arguing that it was prejudiced only by Berkley's initial representation that the *SFS Claim* was

covered); *see also Bluestein & Sander v. Chi. Ins. Co.*, 276 F.3d 119, 122 (2d Cir. 2002) ("Under

New York common law, an insurer, who undertakes the defense of an insured, may be estopped

from asserting a defense to coverage, no matter how valid, if the insurer unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay.").

In short, because Hunt did not report the Hillsdale Claim until after the 2016-2017 Policy expired, it is not covered by that policy, and Berkley has no duty to defend Hunt from it.  Thus, Berkley is entitled to summary judgment on its claims with respect to the Hillsdale Claim, and the Court need not (and does not) consider Berkley's alternative argument that the Hillsdale Claim falls into the Contractual Liability Exclusion, as forceful as that argument may be.

**B.  The SFS Claim**

Whether Hunt is entitled to coverage in connection with the SFS Claim is more easily resolved.  Under both the 2016-2017 Policy and the 2017-2018 Policy, "[t]wo or more Claims . . . arising out of one or more acts, errors, omissions, incidents, events . . . or a series thereof, that are related (either causally or logically) will be considered a single Claim."  2016-2017 Policy at 28-29; 2017-2018 Policy at 40-41.  "All such Claims . . . whenever made, shall be considered first made on the date the earliest such Claim . . . was first made, and only a Policy providing coverage for the earliest Claim . . . shall have any coverage for such Claims."  2016-2017 Policy at 29; 2017-2018 Policy at 40-41.  There is no dispute that the SFS Claim is related to the Hillsdale Claim.  *See* Hunt 56.1 Stmt. ¶ 45 (agreeing that Hunt's designee "acknowledged that, to the best of his understanding, the SFS Claim is related to the Hillsdale [C]laim" and disputing only "any legal conclusion that the relationship between the Hillsdale Claim and the SFS Claim allows Berkley to disclaim coverage for both Claims").  It follows that the SFS Claim and the Hillsdale Claim must "be considered a single Claim . . . first made on the date the [Hillsdale Claim] was first made."  2016-2017 Policy at 28; 2017-2018 Policy at 40.  And because Hunt did not make the Hillsdale Claim until after the 2016-2017 Policy period expired,

it further follows that the SFS Claim was made outside of the reporting period and is not covered.

Hunt argues that, on this theory, it would have been required to report the SFS Claim during the 2016-2017 Policy period — before it was even made. *See* ECF No. 77, at 18. But that is not true. Because the SFS and Hillsdale Claims must be treated as a single claim, Hunt's obligation to report the SFS Claim would have been satisfied had it timely reported the Hillsdale Claim. Courts presented with materially indistinguishable scenarios have reached the same conclusion. *See, e.g.*, *Zahler v. Twin City Fire Ins. Co.*, No. 04-CV-10299 (LAP), 2006 WL 846352, at *8 (S.D.N.Y. Mar. 31, 2006) ("[T]he intent of the parties was to cover claims first made during the policy period and subsequent claims related to the same facts that were the subject of the initial claim or claims."); *Greenburgh Eleven Union Free Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 304 A.D.2d 334, 335-36 (1st Dep't 2003) (affirming a finding that subsequent related claims were "first made" at the time of the first claim asserted and were covered by the policy then in force, even though the insured "never gave specific written notice" of the later claims); *see also Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13-CV-1013 (DAB), 2014 WL 1876984, at *4-5 (S.D.N.Y. May 8, 2014) ("[O]nly if the two Claims are Interrelated Wrongful Acts, would [a claim asserted after the policy's expiration] be covered by the Policy."). Moreover, requiring coverage of the SFS Claim would contradict unambiguous policy language providing that related claims are covered "only [by] a Policy providing coverage for the earliest such Claim." 2016-2017 Policy at 29; 2017-2018 Policy at 41.

Once again, there is no basis to reach a different conclusion on the basis of waiver or estoppel. Wisely, given both its own concessions and the discussion above, Hunt does not even argue that Berkley waived its right to argue that the SFS Claim is related to the Hillsdale Claim.

Hunt does argue estoppel, on the ground that Berkley initially represented that it would cover the SFS Claim. ECF No. 77, at 19-20. Here too, however, Hunt fails to show prejudice. *See Bluestein*, 276 F.3d at 122. Hunt claims that Berkley's initial representation prejudiced it by causing Hunt (1) to "share privileged invoices with [Berkley,] its now adversary"; (2) to "litigate believing that Berkley would fund its defense"; and (3) "to purchase another year of insurance coverage" running from 2018 to 2019. *See* ECF No. 77, at 20. But if sharing privileged invoices were *per se* prejudicial, every insurer who initially paid for defense costs would be estopped from later raising a defense to coverage. That is not the law. *See, e.g.*, *Federated Dep't Stores, Inc. v. Twin City Fire Ins. Co.*, 28 A.D.3d 32, 37-40 (1st Dep't 2006) (reversing a trial court's holding of equitable estoppel even though the insurer "assumed [the insured's] defense without a reservation of rights" because the insured was "unable to establish . . . prejudice caused by [the insurer's] allegedly belated disclaimer"); *Nat'l Indem. Co. v. Ryder Truck Rental, Inc.*, 230 A.D.2d 720, 721-22 (2d Dep't 1996) (holding that there were questions of fact as to whether the insured was prejudiced by the insurer's three-year delay in reserving its right to disclaim coverage, even though the insurer undertook the insured's defense during that period); *cf. U.S. Fidelity & Guar. Co. v. New York Susquehanna & W. Ry. Corp.*, 275 A.D.2d 977, 978-79 (4th Dep't 2000) (finding prejudice because the insurer's "first assertion of a possible disclaimer [was] on the eve of [a] settlement conference [and] placed in jeopardy a favorable settlement negotiated by [the insured's] attorneys, and forced [the insured] to agree to litigate the coverage issues in order to save the settlement"). Notably, Hunt does not identify a single case suggesting, let alone holding, that disclosure of privileged documents can cause prejudice warranting estoppel. Nor does Hunt explain how it was so prejudiced by the disclosure of invoices here.

20

For similar reasons, Berkley is not estopped merely because Hunt and Berkley renewed the policy.  Hunt cites, and the Court has found, no case suggesting that an insurer can be estopped from asserting a defense to coverage merely because the insured renewed coverage in reliance on the insurer's representation that a claim was covered.  Regardless, there is absolutely no evidence that Hunt renewed its policy because Berkley represented that the SFS Claim was covered.  Hunt pins this argument entirely on its attorney's declaration that he is "informed and believe[s]" that, at the time the 2018-2019 Policy was negotiated and executed, Berkley had represented that the SFS Claim was covered.  *See* ECF No. 77, at 19-20; ECF No. 60, ¶ 4.  Although such *post hoc, ergo propter hoc* reasoning may occasionally have "some value," *The Mason*, 249 F. 718, 721 (2d Cir. 1918), it has none where, as here, the party making the argument would have direct evidence if the purported cause had in fact resulted in the purported effect.  That Hunt cannot find a single witness willing to swear that Hunt would not have renewed the policy but for Berkley's representation is fatal to Hunt's assertion of prejudice.

Finally, the Court finds Hunt's argument that it "litigate[d] believing that Berkley would fund its defense," ECF No. 77, at 20, puzzling, as SFS has not yet filed any claims against Hunt.  *See* Hunt 56.1 Stmt. ¶ 42.  To the extent that Hunt argues that Berkley's representation regarding the SFS Claim caused Hunt to believe that Berkley would cover the Hillsdale Claim, such belief alone — even if reasonable — does not constitute prejudice.  *See Federated Dep't Stores, Inc.*, 28 A.D.3d at 39 ("Prejudice is established only where the insurer's control of the defense is such that the character and strategy of the lawsuit can no longer be altered.").  And although Hunt asserts that Berkley exerted control over Hunt's defense of the claims by insisting that Hunt abide by Berkley's counsel guidelines, Hunt fails to explain how that affected any decision it made in the course of the litigation.

21

In sum, because the Hillsdale Claim was not timely reported, and the SFS Claim and the Hillsdale Claim constitute a single claim, the SFS Claim is also not covered.  It follows that Berkley is entitled to summary judgment with respect to the SFS Claim, as well.  Once again, the Court need not and does not consider Berkley's alternative argument that the SFS Claim is not covered by virtue of the Contractual Liability Exclusion.

## CONCLUSION

For the foregoing reasons, Hunt's motion for partial summary judgment is DENIED, and Berkley's motion for summary judgment is GRANTED in its entirety.

One housekeeping matter remains:  By letter-motions, both Berkley and Hunt sought to file certain documents under seal.  *See* ECF Nos. 43, 55, 61, 71, 81, 86, 90, 91.  The Court granted the letter-motions temporarily, pending its decision on the underlying motions.  *See* ECF Nos. 47, 56, 62, 72, 82, 88.  It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  Moreover, the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (citing cases).  Thus, any party that believes any materials currently under seal should remain under seal or be redacted is ORDERED to show cause in writing, no later than **two weeks from the date of this Opinion and Order**, why doing so would be consistent with the presumption in favor of public access.  If, by that deadline, no party contends that any particular documents should remain under seal or in redacted form, then the parties shall promptly file such documents publicly on ECF.

The Clerk of Court is directed to terminate ECF Nos. 27 and 67 and to close the case.

SO ORDERED.

Dated: June 4, 2020
       New York, New York

_____
                              JESSE M. FURMAN
                        United States District Judge